### PEOPLES MORTGAGE COMPANY, INC.,

v.

### FEDERAL NATIONAL MORTGAGE ASSOCIATION, d/b/a Fannie Mae.

### Civ. A. No. 92–7275.

United States District Court, E.D. Pennsylvania.

May 19, 1994.

---

914

George W. Croner, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Peoples Mortg. Co., Inc.

Sandra A. Girifalco, Andre L. Dennis, Nicholas Deenis, Jeffrey M. Lindy, Stradley, Ranon, Stevens & Young, Philadelphia, PA, for Federal Nat. Mortg. Ass'n.

Lawrence J. Schempp, Cohen, Shapiro, Polisher, Shiekman & Cohen, Judah I. Labovitz, Philadelphia, PA, for Meridian Mortg. Corp.

*MEMORANDUM*

GILES, District Judge.

Federal National Mortgage Association ("Fannie Mae" or "FNMA"), moves for summary judgment as to all of Peoples Mortgage Company's ("Peoples") claims. Peoples moves for summary judgment as to Count IV of Fannie Mae's Amended Counterclaim. For the reasons stated below, both motions are granted.

## I. JURISDICTION

Peoples brought this action in the Court of Common Pleas of Montgomery County on November 24, 1992. On December 18, 1992, Fannie Mae removed the case to this court pursuant to 28 U.S.C. § 1441. 28 U.S.C. § 1441(a) provides in relevant part:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Fannie Mae is a federally chartered corporation, 12 U.S.C. § 1717(a)(2)(B), and the National Housing Act, 12 U.S.C. § 1723a(a), confers subject matter jurisdiction upon this court.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence. *Id.,* 477 U.S. at 255, 106 S.Ct. at 2513. Instead, the court's sole function is to determine if there are any disputed facts, and, if there are, to determine whether the dispute is both genuine and material. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. All reasonable inferences from the facts must be drawn in favor of the non-moving party. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987). Summary judgment is inappropriate if "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

## III. FACTUAL BACKGROUND

Fannie Mae is a federal government-sponsored private corporation created by Congress to establish secondary market facilities for home mortgages and, among other things, to provide stability in the secondary market for home mortgages. 12 U.S.C. §§ 1716, 1716b. According to Fannie Mae's Mission Statement, Fannie Mae's "unique corporate mission is to be the nation's housing partner in providing financial products and services that increase the availability and affordability of housing for low-, moderate-, and middle-income Americans." FNMA Ex. A.

Fannie Mae purchases mortgages from approved lenders who may also service the loans for Fannie Mae. Reich Verification, FNMA Ex. B. Under this arrangement, the lender, having granted a loan and taken back a home mortgage as a security, will sell the mortgage to Fannie Mae and either sell the mortgage servicing rights to a third party for a fee or do the servicing itself and receive income therefrom. Complaint ¶ 9.

"Servicing" for a mortgage loan owned by Fannie Mae typically includes the receipt by the servicer of monthly mortgage payments, the crediting of those payments to the borrower's account, the remitting to Fannie Mae of principal and interest sufficient to produce the "pass-through" rate or "required net yield" contracted for by Fannie Mae, the maintenance of escrow accounts for taxes and insurance, and, if necessary, the commencement of any action required to restore a delinquent account. Complaint ¶ 10. In return for performing such servicing functions, mortgage lenders contracting with Fannie Mae retain an annual fee. Complaint ¶ 11.

Lenders doing business with Fannie Mae must meet certain criteria to be approved sellers and servicers of mortgages that Fannie Mae purchases. Reich Verification, FNMA Ex. B. Fannie Mae relies upon the integrity of its approved lenders to originate,

underwrite and service mortgages properly. In addition, Fannie Mae conducts periodic reviews of the lender's selling and servicing to determine if the seller/servicer is complying with criteria established by Fannie Mae. *Id.*

Plaintiff Peoples is a mortgage banking company incorporated under the laws of Pennsylvania, with its principal place of business in Montgomery County Pennsylvania. In July 1987, Peoples entered into a Mortgage Selling and Servicing Contract (the "Contract") with Fannie Mae, *see* Peoples Ex. 2, under which Peoples was approved to sell and service mortgages for Fannie Mae. Complaint ¶ 17. Pursuant to the Contract, Peoples was an approved seller of mortgages to Fannie Mae, and an approved servicer of mortgages that Fannie Mae purchased from Peoples from time to time. The Contract and the Guides to Lenders ("Guides") set forth the terms and conditions of sales of mortgages by Peoples to Fannie Mae and further delineated the requirements of servicing those mortgages. Reich Verification, FNMA Ex. B. The group of Fannie Mae owned mortgages serviced by Peoples is referred to as the "Servicing Portfolio."

The Contract could be terminated by Fannie Mae with or without cause. If Fannie Mae terminated Peoples' mortgage servicing with cause, Peoples was not entitled to receive any compensation. If Fannie Mae terminated the servicing without cause, Peoples was entitled to a fee to be computed under the Contract and the Guides. Termination of Peoples' right to sell mortgages to Fannie Mae could occur with or without cause without any payment of compensation to the Peoples. Reich Verification, FNMA Ex. B; Contract, Peoples Ex. 2 at ¶¶ IX.C.1, IX.C.2.[1]

On May 17, 1991, Fannie Mae decided to terminate Peoples' mortgage selling and servicing rights under the Contract. A letter of termination was hand delivered to Peoples that day, notifying Peoples that its mortgage selling and servicing rights under the Contract were being terminated for cause. *See* Letter of Termination, FNMA Ex. F; Lis Dep., Peoples Ex. 11 at 115. Fannie Mae also asked Peoples to return to Fannie Mae all files and records that Peoples held on the Fannie Mae-owned mortgages being serviced by Peoples. Berger Dep., FNMA Ex. D at 119. Peoples disputed Fannie Mae's contention that the termination was for cause, and refused to release the mortgage files and records to Fannie Mae. Berger Dep., FNMA Ex. D at 119, 158.

During the two weeks following the May 17 termination, Peoples, Fannie Mae, and their respective counsel engaged in extensive negotiations, culminating in the execution by both parties of a letter agreement, dated May 30, 1991 (the "Letter Agreement"). *See* Complaint ¶¶ 36–39; FNMA Ex. E (Letter Agreement); FNMA Ex. H (May 20 draft letter agreement); FNMA Ex. I (May 21 draft letter agreement); FNMA Ex. J (May 24 draft letter agreement).

The Letter Agreement, which states that it "represent[s] the full agreement reached by Fannie Mae and Peoples," provides, *inter alia:*

> Peoples was servicing a portfolio of mortgages owned by Fannie Mae ("Servicing Portfolio"). By written notice dated May 17, 1991, Fannie Mae terminated [the Contract with Peoples] for cause. However, in consideration for the resolution of all disputed issues, as set forth in this letter, Fannie Mae agreed to withdraw such termination and issue a suspension subject to compliance with the terms set forth below.

FNMA Ex. E.

The Letter Agreement continues, providing, *inter alia:* (a) "Fannie Mae has all rights to the Servicing Portfolio," except as specifically provided in the Letter Agreement. *Id.* at ¶ 1; (b) Effective as of May 17, 1991, the Servicing Portfolio "will be subserviced on Fannie Mae's behalf by Meridian Mortgage." *Id.* at ¶ 1; (c) Peoples may retain until May 29, 1991, a portion of the Servicing Portfolio that it was attempting to transfer to two other lenders. *Id.* at ¶ 2; (d) Peoples will be permitted to sell mortgages to Fannie Mae under the terms of commitments which had not expired as of May 17,

---

1. According to Peoples, the fee due for a servicing termination without cause in this case would have been approximately $840,000. Berger Decl., Peoples Ex. 1, at ¶ 20.

1991. *Id.* at ¶ 3; (e) Peoples will be permitted until December 1, 1991, to "complete a sale of the servicing of the mortgages in the Servicing Portfolio to an acceptable Fannie Mae Seller/Servicer." *Id.* at ¶ 4; (f) Until the expiration of the period during which Peoples may sell the servicing of the mortgages in the Servicing Portfolio, Peoples will receive servicing income to the extent that the servicing income exceeds Peoples obligations to Fannie Mae. *Id.* at ¶ 5; and, (g) Peoples will honor its commitments to Fannie Mae, including obligations to repurchase certain mortgages originally sold by Peoples to Fannie Mae. *Id.* at ¶ 6.

In the months following the execution of the Letter Agreement, Peoples was not able to consummate the sale of the servicing rights, despite being given two extensions beyond the December 1, 1991 deadline set in the Letter Agreement for that sale. Peoples' status as a "suspended" servicer remained in place, and Peoples was never reinstated as a fully approved servicer of Fannie Mae mortgages. In addition, Fannie Mae made what Peoples characterizes as "excessive" demands that Peoples repurchase loans originally sold by Peoples to Fannie Mae. In November, 1992, Peoples brought this lawsuit.

Fannie Mae now moves for summary judgment as to all counts of Peoples' complaint, while Peoples moves for summary judgment as to Count IV of Fannie Mae's Amended Counterclaim. The dispute is governed by Pennsylvania law.

## IV. DISCUSSION

The resolution the parties' motions turns substantially upon the question of whether the Letter Agreement is enforceable. Therefore, we will resolve that issue first, and then go on to consider each of Peoples claims against Fannie Mae, and Fannie Mae's counterclaim against Peoples.

### A. Enforceability of the Letter Agreement

Peoples maintains that the May 30 Letter Agreement is unenforceable because it was executed under duress, it lacks consideration, and it is unconscionable. The court disagrees.

### 1. Duress

■ Peoples argues that the Letter Agreement is unenforceable because it was executed under duress. However, the court finds that, under the undisputed facts, Peoples' claim of duress fails as a matter of law because Peoples was free to consult with counsel and could have pursued immediate legal remedies if it thought the Letter Agreement was unfair. In addition, even if the Letter Agreement had been executed under duress, Peoples' behavior after the Agreement was signed served to ratify it.

### a. Peoples consulted with counsel

The Pennsylvania Supreme Court has held that "in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel." *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 431, 233 A.2d 519 (1967) (citing *Smith v. Lenchner*, 204 Pa.Super. 500, 504, 205 A.2d 626 (1964)); *accord*, *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 891–92 (3d Cir.1975). It is undisputed that Peoples consulted with counsel throughout the negotiations leading to the Letter Agreement. Indeed, the undisputed evidence shows that the Letter Agreement was the end result of numerous discussions and drafts, and that Peoples' counsel, Samuel Becker ("Becker"), was actively involved at each stage of the process.

On May 17, 1991, when Jay Berger, President and sole shareholder of Peoples, was notified of Fannie Mae's termination of the Contract, he telephoned Becker, who then called Fannie Mae representatives. Becker Dep., FNMA Ex. G at 32–33; Berger Dep., FNMA Ex. D at 123. During the ensuing telephone conversation, in which Berger participated, Reich Dep., FNMA Ex. C at 7, Peoples' counsel and counsel for Fannie Mae discussed several points that were to be included in a written agreement.

On May 20, 1991, Becker sent a draft letter agreement, prepared by his office, to Jay Berger for his review. FNMA Ex. H. With certain changes suggested by Berger, the May 20 draft became a draft that Becker sent to Fannie Mae on May 21. In the cover letter attached to the May 21 draft, sent to Fannie Mae's counsel, Sherri Reich, Becker wrote:

> I want to thank you for spending time with us Friday afternoon [May 17] so we could reach an agreement acceptable to both our clients.
>
> The suspension letter delivered to Peoples Mortgage Company, Inc. on Monday [May 20] did not contain all of the provisions which we had agreed to on Friday afternoon. I have prepared a letter for you to send to Peoples Mortgage Company, Inc. which I believe covers all our agreements. If the letter is acceptable, please have it executed and delivered to Jay Berger. If you have any questions or comments, please call me so we can quickly resolve any open points.

FNMA Ex. I.

The above-quoted cover letter is undisputed evidence that the May 17 phone call was aimed at "reach[ing] an agreement acceptable to both" parties, and that the May 21 draft sent to Fannie Mae by Becker was intended by Becker to cover all of the mutually arrived at agreements. In response to the May 21 draft, Fannie Mae delivered a revised draft to Peoples on May 24. *See* FNMA Ex. J.

Peoples contends that the May 24 draft provided by Fannie Mae "completely ignored Becker's initial May 21 draft," Peoples Mem. at 66, and was "a wholly different version of a written agreement," *id.* at 40. Comparison of the documents, however, reveals that the May 24 draft, while probably more favorable to Fannie Mae's interest, incorporated many aspects of the earlier drafts provided by Becker. Becker testified that Fannie Mae's May 24 draft "changed the deal," Peoples Ex. 30, Becker Dep. at 85. However, it is hard to imagine a process of negotiation and reduction of an agreement to writing in which each side does not attempt to refashion the writing to better suit its own interest.

After the May 24 draft was presented to Peoples, Becker made a few handwritten requested changes to the document. *See* FNMA Ex. J. There is no evidence that any other changes were requested by Peoples or its counsel. All of Becker's suggested changes were incorporated into the final, May 30, version of the Letter Agreement. Six days later, Jay Berger signed the Letter Agreement after reading it and discussing it with Peoples' counsel. Berger Dep. at 215–17.

The above-described undisputed facts show that, at all times leading up to the signing of the Letter Agreement, Peoples was "free to consult with counsel," *Carrier, supra,* and that in fact Peoples' counsel was involved in the negotiation and formulation of the letter agreement. Under these circumstances, *Carrier* commands that there was no duress, as a matter of law.

Peoples mistakenly relies upon *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971) to support its claim that the Letter Agreement was executed under duress. In *Litten,* a divided Superior Court held that the plaintiffs could raise duress as defense to enforcement of an agreement in spite of the fact that they were represented by counsel at the time the agreement was made.

Peoples' reliance upon *Litten* is misplaced for several reasons. First, *Litten* was decided under New York law. The court "note[d] in passing that Pennsylvania law does not differ and, therefore, if it were to be applied, the result here reached would be the same," *Litten,* 220 Pa.Super. at 282 n. 2, 286 A.2d 913, but gave no analysis to support the claim that Pennsylvania and New York law are in accord. Most of the legal authority discussed by the *Litten* majority is from New York courts or applying New York law, and the majority never discussed or even cited *Carrier,* the leading Pennsylvania Supreme Court decision on duress. The *Litten* dissent, which would have held that the duress claim was not available, cited *Carrier* as authority that when an agreement is signed upon advice of counsel, any contention of duress is nullified. 220 Pa.Super. at 290, 286

A.2d 913 (Montgomery, J., dissenting). Given the *Litten* majority's cursory treatment of the relationship between New York and Pennsylvania law, and its failure to distinguish or even discuss *Carrier*, we do not find *Litten* to be persuasive authority.[2]

### b. Peoples could have pursued an immediate legal remedy

Also militating against Peoples' claim that the Letter Agreement was executed under duress is the fact that Peoples could have pursued immediate legal remedies against Fannie Mae, rather than sign the agreement, if it thought the terms of the agreement were unfair and oppressive. *See, e.g., National Auto Brokers Corp. v. Aleeda Dev. Corp.,* 243 Pa.Super. 101, 364 A.2d 470, 474 (1976); *Kennington Ltd. v. Wolgin,* Civil Action No. 89–80, 1989 WL 55395 at *4 (E.D.Pa. May 23, 1989); *Levin v. Garfinkle,* 492 F.Supp. 781, 807 (E.D.Pa.1980), *aff'd,* 667 F.2d 381 (3d Cir.1981); *compare, Litten,* 220 Pa.Super. at 280, 286 A.2d 913 (finding duress under New York law where, among other things, there was no possibility of immediate legal relief).

Peoples asserts that the May 17 termination for cause was unjustified. In particular, Berger has declared that at that time he "was certain that Fannie Mae had made an error" regarding a claimed shortage in Peoples' tax and insurance escrow account. Berger Decl. ¶ 16. Yet, rather than engage counsel to seek injunctive relief against Fannie Mae at that time or otherwise commence legal action to protect its interests, Peoples engaged Becker to negotiate a settlement of the dispute. Peoples apparently "concluded that it was more prudent to settle . . . than to litigate." *Levin,* 492 F.Supp. at 808. This failure of Peoples to pursue immediate legal remedies reinforces the court's decision that it will not now find that Peoples executed the Letter Agreement under duress. *See id.; Kennington,* 1989 WL 55395 at *4 ("Most

---

**2.** Even if we were to accept the authority of *Litten,* it is distinguishable on its facts from the instant case. The parties in *Litten* had orally agreed that, in exchange for all the stock in plaintiffs' corporations, defendant would, among other things, pay the corporations' creditors. In reliance upon this oral agreement, plaintiffs made no effort to satisfy their financial obligations and transferred to defendant the entire stock of their corporations. At the same time, plaintiffs waived or relinquished their rights to repayment of loans they had made to their corporations. Thus, defendant became sole owner of the two corporations and plaintiffs were left totally dependent on defendant to carry out its oral promises.

Defendant made an initial payment to the creditors, but then refused to pay the creditors in full on the date payment was due. The creditors immediately threatened plaintiffs with bankruptcy. Four days after the last date for payment, defendant delivered to plaintiffs a written agreement which defendant stated had to be signed that day. The agreement was basically different from the one previously orally agreed upon and plaintiffs refused to sign. Defendant insisted that neither the creditors nor the banks would be paid unless plaintiffs signed the written agreement as prepared by defendant's attorney.

Plaintiffs' attorney, who was a brother of defendant's attorney, advised plaintiffs that they had no alternative but to sign. Plaintiff Litten then telephoned defendant's President, telling him that he had stolen their business, that he was "putting a gun to his head," and was requiring them to sign a different agreement, to which the President replied that if the agreements were not signed that would be the end of the transaction; he would not pay the creditors. Faced with immediate financial disaster and without immediate legal relief, plaintiffs signed the agreement.

Afterwards, continuous requests by plaintiffs of defendant's President that the earlier oral agreement be honored brought no relief for plaintiffs. In fact, because of plaintiff Litten's insistence that the oral promises of defendant be lived up to, all the plaintiffs who had begun work for defendant were fired within two months after they began work.

Before and after the termination of his employment, plaintiff Litten attempted to prevail upon their then counsel who was, as already stated, brother of defendant's counsel, to have defendant agree to the original terms or to institute legal action against defendant, but was told to "just take it easy, and just work, and let me work on it." Later, when further pressed, plaintiffs' counsel required a $5,000 retainer fee prior to instituting suit, which fee plaintiffs were not in a position to pay. Only later, when plaintiffs acquired the services of a different counsel, was suit instituted in their behalf. 220 Pa.Super. at 279–82, 286 A.2d 913.

The apparently cozy relationship between plaintiffs' and defendant's counsel, the failure of plaintiffs' counsel to even attempt to negotiate more favorable terms and his advice to them that "they had no alternative" but to sign, all distinguish *Litten* from the instant case. *See Zlotnicki,* 779 F.2d at 911–12 (holding that under Pennsylvania law opportunity to consult with counsel before signing agreement vitiates duress defense; and that *Litten* does not reject this principle).

obvious to the Court is the option of defendant to bring an action for preliminary injunction to protect these asserted rights. The availability of this and other legal remedies negates the claim for economic duress.").

### c. Peoples ratified the Letter Agreement

■ An agreement executed under economic duress is not void *ab initio*. Instead, under Pennsylvania law, a contract executed under economic duress is voidable. *Wahsner v. American Motors Sales Corp.*, 597 F.Supp. 991, 998 (E.D.Pa.1984). Such a contract can be ratified if the party who executed it under duress "accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Id.; accord National Auto Brokers*, 364 A.2d at 476; *Seal v. Riverside Federal Savings Bank*, 825 F.Supp. 686, 695–96 (E.D.Pa.1993).

■ Despite Peoples' assertion that it did not ratify the Letter Agreement, the evidence is undisputed that neither Peoples nor its counsel ever attacked its enforceability until this litigation was filed, some eighteen months after the Letter Agreement was signed. Indeed, Peoples did not raise a duress claim until sometime *after* the Complaint was filed. Peoples did not mention duress in its response, dated May 24, 1993, to interrogatories from Fannie Mae. Instead, Peoples claimed the Letter Agreement was without consideration. Peoples did not raise duress as a defense until it filed amended affirmative defenses to Fannie Mae's counterclaim in January 1994.

Before bringing this action, Peoples at least twice sought and received modifications of the Letter Agreement without questioning its enforceability. On September 25, 1991, Peoples' counsel wrote to Fannie Mae and proposed "an alternative repurchase plan for Fannie Mae's consideration." FNMA Ex. P. Peoples' counsel stated that the proposed alternative "repayment schedule [was] not a novation of the [Letter Agreement], but rather [was] a means of accomplishing the repayment terms set forth in the subject Agreement." *Id.*

On November 25, 1991, Peoples wrote Fannie Mae and asked for an extension of time until December 31, 1991 to complete a sale of the Servicing Portfolio pursuant to the terms of the Letter Agreement. Complaint ¶ 124; FNMA Ex. 3. In that letter, Peoples referred to the Letter Agreement as "our agreement," and proposed that "additional time for all parties involved to complete their obligations would be beneficial to all concerned." Fannie Mae agreed to this extension, and to another one. FNMA Exhibits L, N. On February 3, 1992, Jay Berger responded to the later extension by stating his belief that it "serve[d] the best interest of all parties concerned."

Thus, rather than seek to avoid the Letter Agreement that Peoples now claims was entered into under duress, Peoples sought, successfully, to modify it. Under these circumstances, the court finds that even if the original agreement had been entered into under duress, Peoples subsequent conduct would have ratified it. *Seal*, 825 F.Supp. at 696 (attempt to modify an agreement allegedly entered into under duress is a ratification); *compare Litten*, 220 Pa.Super. at 279–82, 286 A.2d 913 (no ratification, under New York law, when there were continuous requests made by plaintiffs of defendant that the earlier oral agreement be honored, and repeated unsuccessful attempts by plaintiffs to convince their own counsel to have defendant agree to the original terms or to institute legal action against defendant).

### 2. Consideration for the Letter Agreement

Peoples asserts that the Letter Agreement is unenforceable for lack of consideration. The court disagrees.

■■ Under Pennsylvania law, an agreement is enforceable only if it is supported by consideration on both sides. *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3d Cir.1986) (citing *Stelmack v. Glen Alden Coal Co.*, 339 Pa. 410, 14 A.2d 127 (1940); *Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228 (1978)). "Consideration 'confers a benefit on the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for

and given in exchange for the original promise.'" *Id.* (quoting *Curry v. Estate of Thompson,* 332 Pa.Super. 364, 371, 481 A.2d 658, 661 (1984)). Failure of consideration goes to the heart of any claim based upon an agreement and is always available as a defense to that claim. *M.N.C. Corp. v. Mt. Lebanon Medical Center, Inc.,* 510 Pa. 490, 509 A.2d 1256, 1259 (1986) (citing *In re Levine's Estate,* 383 Pa. 354, 118 A.2d 741 (1955)).

Examination of the Letter Agreement reveals that it contains promises by Fannie Mae to: (1) withdraw the termination and issue a suspension; (2) permit Peoples to retain that portion of the portfolio the servicing of which Peoples was attempting to transfer to Landmark Savings Bank or Fidelity Bond and Mortgage Corporation; (3) allow Peoples to fill open commitments to sell mortgages to Fannie Mae; (4) allow Peoples to complete a sale of the servicing of the mortgages in the portfolio by December 1, 1991, to an acceptable Fannie Mae seller/servicer; (5) remit to Peoples any remaining portion of the proceeds from this sale of the servicing after Fannie Mae was reimbursed for those monies due Fannie Mae; and (6) comply in good faith with any legally enforceable subpoena concerning mortgages in the mortgage servicing Portfolio.

Peoples asserts that none of the above-described promises by Fannie Mae conferred a benefit on Peoples or caused a detriment to Fannie Mae, and that, therefore, there was no consideration from Fannie Mae for the Letter Agreement. Peoples asserts that none of the promises made by Fannie Mae is consideration for the agreement because they either represent performances that Fannie Mae was already legally bound to render, *see, e.g., Cohen v. Sabin,* 452 Pa. 447, 307 A.2d 845 (1973) (no consideration where party is already legally bound to render the promised performance); 17A Am.Jur.2d § 163 (where a contract does not contemplate the making of a subsequent agreement, the original consideration will not support the subsequent agreement), or the consideration bargained for as part of the agreed upon exchange did not pass, *see, e.g., McGuire v. Schneider, Inc.,* 368 Pa.Super.

344, 534 A.2d 115, 118 (1987) (citing *Necho Coal Co. v. Denise Coal Co.,* 387 Pa. 567, 569, 128 A.2d 771, 772 (1957)), *aff'd,* 519 Pa. 439, 548 A.2d 1223 (1988).

The court finds, however, that the Letter Agreement was supported by consideration. The benefits conferred on Peoples included withdrawal of its termination and substitution of a suspension in its place, and the right to retain certain files that belonged to Fannie Mae.

### a. Withdrawal of the termination

Fannie Mae promised in the Letter Agreement to withdraw the termination of Peoples and issue a suspension in its place. The possibility of a change of the termination to a suspension was discussed in the May 17 telephone conversation, *see* Becker Dep., FNMA Ex. 1 at 52, and was part of both Becker's May 21 and Reich's May 24 drafts of the Letter Agreement. The May 24 draft stated that Fannie Mae "agreed to convert such termination to a suspension subject to compliance with" the other terms of the letter. FNMA Ex. J. At Becker's request the terms of the agreement were modified to state that Fannie Mae "agreed to withdraw such termination and issue a suspension subject to compliance with" the other terms of the letter. FNMA Ex. J (showing Becker's handwritten requested changes); FNMA Ex. E (Letter Agreement, incorporating Becker's requested changes).

This withdrawal of the termination in favor of a suspension provided a benefit to Peoples, and thus serves as consideration for the Letter Agreement. Peoples' counsel testified that "Mr. Berger felt that a suspension was better for the company than a termination." Becker Dep., FNMA Ex. G at 56; *see also id.* at 57. Jay Berger has admitted that Peoples' status as a suspended, rather than terminated, lender was of benefit to Peoples, particularly with respect to maintaining Peoples' "warehouse" line of credit with CoreStates Bank, which Berger declared to be "an essential component of any mortgage banking company." Berger Decl.,

Peoples Ex. 1 at ¶ 22.[3] Because of the Letter Agreement provision that the "termination" was withdrawn, and that instead, Peoples was merely "suspended," Peoples never had to, and never did, advise Core-States that it had been terminated. As a result, "everything was business as usual as far as the warehouse line was concerned," Berger Dep., FNMA Ex. 2 at 153–54, and Peoples was able to maintain its warehouse line for over one year after the suspension, *id.* at 44.

Peoples raises several arguments as to why the withdrawal of the termination and the substitution of a suspension was not consideration for the agreement, in spite of the fact that it apparently conferred a benefit to Peoples.

Peoples' principal argument is that Fannie Mae never had cause to terminate the Contract, and that, therefore, Fannie Mae's withdrawal of the termination gave Peoples no more than that to which it was already entitled under the Contract. Relying upon the long-established "pre-existing duty" rule that "performance of that which one is already legally obligated to do is not consideration sufficient to support a valid agreement," *Cohen v. Sabin,* 452 Pa. at 453, 307 A.2d at 849; *accord, In re Commonwealth Trust Co.,* 357 Pa. 349, 354, 54 A.2d 649 (1947); *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285, 199 A. 139, 141 (1938); *Blaisdell Filtration Co. v. M.L. Bayard & Co.,* 311 Pa. 6, 9, 166 A. 234, 235 (1933); *Crown v. Cole,* 211 Pa.Super. 388, 392, 236 A.2d 532, 534 (1967); 3 *Williston on Contracts* § 7:36 (4th ed. 1992); Restatement (Second) of Contracts § 73 (1981); 17 C.J.S. Contracts §§ 110 *et seq.,* Peoples concludes that Fannie Mae's withdrawal of the termination is not consideration for the Letter Agreement.[4]

■ Peoples' argument, however, ignores an equally well-established exception to the "pre-existing duty" rule: "[I]f there is an honest dispute over the interpretation of the original agreement," 3 *Williston on Contracts* § 7:36 at 584–85 (4th ed. 1992), or if a claim or defense arising out of the original agreement is "doubtful because of uncertainty as to the facts or the law," Restatement (Second) of Contracts § 74, the settlement of the dispute furnishes sufficient consideration for the new agreement. *Accord, Cohen,* 452 Pa. at 453, 307 A.2d at 849; *Lombardo v. Gasparini Excavating Co.,* 385 Pa. 388, 391, 123 A.2d 663, 665 (1956); *Warren Tank Car Co.,* 330 Pa. at 285, 199 A. at 141; *Kefover v. Potter Title & Trust Co.,* 320 Pa. 51, 58, 181 A. 771, 774 (1935); *Blaisdell,* 311 Pa. at 9, 166 A. at 235; *Crown,* 211 Pa.Super. at 392, 236 A.2d at 534; 17 C.J.S. Contracts § 112 (1963). This exception to the pre-existing duty rule is rooted in "the traditional policy of favoring compromises of disputed claims in order to reduce the volume of litigation." Restatement (Second) of Contracts § 74, Comment a.

■ Under the undisputed evidence, a reasonable jury would have to find that such an "honest dispute over the interpretation" of the Contract existed in the instant case. Fannie Mae thought that it had cause to terminate Peoples, and Peoples thought that cause did not exist. Even in the sometimes heated words of its brief, Peoples never suggests that Fannie Mae's termination was a deliberate plan to terminate Peoples without any belief on Fannie Mae's part that Peoples' performance was inadequate. Peoples characterizes Fannie Mae's action as resulting from a "dangerous combination of ignorance and incompetence," and based upon an "erroneous conclusion," stemming from a "frighteningly incompetent audit" performed by Fannie Mae, Peoples' Mem. at 2–3. However, there is no evidence that Fannie Mae did not have an honest belief that it was terminating Peoples for cause.

■ In addition to requiring that a dispute be "honest" if its settlement is to serve

---

**3.** Under the warehouse agreement with Core-States, Peoples was required to provide satisfactory evidence of certification by Fannie Mae. FNMA Ex. 7, § 6.22.

**4.** More precisely, Peoples contends that there is a genuine issue of fact as to whether the termination was for cause or without cause, and therefore, the question of whether promises already made by Fannie Mae under the Contract can provide consideration for the Letter Agreement must be left to a jury.

as consideration for a new agreement, Pennsylvania courts have required that the dispute be "reasonable." *Warren Tank Car Co.*, 330 Pa. at 285, 199 A. at 141. The reasonableness of the dispute is "to be judged as it appeared to the parties at the time." Restatement (Second) of Contracts § 74, Comment b. Because the evidence submitted by the parties is not such that this court could enter summary judgment or a directed verdict in Peoples' favor as to the issue of whether Peoples' termination was for cause, we conclude as a matter of law that Fannie Mae's stance was reasonable as well as honest. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment inappropriate when "reasonable minds could differ as to the import of the evidence"). Any other conclusion would vitiate the purpose of this exception to the pre-existing duty rule by inviting litigation of the underlying dispute whenever a party to a settlement of that dispute is later unsatisfied with the terms of the settlement.

■ Peoples argues that even if the withdrawal of the termination in favor of a suspension constituted "new" consideration not already due to Peoples under the Contract, a failure of consideration ensued when Fannie Mae failed to perform on its promise. In essence, Peoples argues that Fannie Mae's suspension was "a suspension in name only," and that Fannie Mae "has continued to treat Peoples as a terminated lender since May 1991." Peoples Mem. at 70.

Peoples' argument is without merit for two reasons. First, as discussed above, Peoples has acknowledged that, because of the effect on its warehouse line of credit with CoreStates Bank, it did derive some benefit from its status as a suspended, rather than terminated, lender. Additionally, the Letter Agreement does not promise that Peoples would eventually be fully reinstated. Reinstatement is not even mentioned in the Letter Agreement. *See* FNMA Ex. E. Even the May 20 first draft of the agreement, made by Peoples' counsel, is open ended about the length of the suspension and does not contemplate a date of reinstatement. *See* FNMA Ex. H. Thus, Fannie Mae never promised to reinstate Peoples at some time in the future. According to the testimony of Fannie Mae's counsel and representatives, Fannie Mae discussed the possibility of reinstating Peoples many times after execution of the Letter Agreement, but each time decided not to reestablish a selling relationship with Peoples. Reich Dep., FNMA Ex. 8 at 53–54, 84–87; Logan Dep., FNMA Ex. 9 at 121–22.

Although the Letter Agreement does not contemplate a reinstatement, Peoples argues that eventual reinstatement of a suspended lender is required by Fannie Mae's Servicing Guide. According to Peoples, the Guides "clearly contemplated a suspension as a rehabilitative measure to be used in connection with improving, not ending, a lender's performance." Peoples Mem. at 35–37. The sections of the Guides relied upon by Peoples, however, do not support its argument.

We first note that the Letter Agreement, which states that it is the "full agreement" between Fannie Mae and Peoples, does not state that the duration of the suspension is to be controlled by the Guides. Moreover, the sections of the Guides relied upon by Peoples speak in terms of what Fannie Mae will "generally" or "usually" do when making a termination or suspension, not of what Fannie Mae is bound to do. *See* Servicing Guide § 209, Peoples Ex. 31; Servicing Guide § 206, Peoples Ex. 32. Finally, the Guides explicitly envision that a suspension may be for an "indefinite period." *Id.* Thus, the Guides provide no support for Peoples' position. *See also* Nichols Dep., Peoples Ex. 13 at 138–39 (suspension, as used by Fannie Mae, "usually" involves the possibility of reinstatement).

In summary, the Letter Agreement promised a suspension, and a suspension is what Peoples received. The withdrawal of the termination in favor of the suspension provided consideration for the Agreement. It is of no relevance that the suspension was not later withdrawn in favor of reinstatement.

### b. *The right to retain certain files*

■ Even if we were to accept Peoples' argument that the withdrawal of the termination was not consideration for the Letter Agreement because it gave Peoples no more

than that to which it was already legally entitled under the Contract, we find that another promise made by Fannie Mae in the Letter Agreement gave Peoples a benefit to which it was not already entitled under the Contract.

The Letter Agreement gives Peoples permission to retain certain files for that portion of the portfolio, the servicing of which Peoples was attempting to transfer to Landmark Savings Bank or Fidelity Bond and Mortgage Corporation. FNMA Ex. E, Letter Agreement at ¶ 2. The Contract, on the other hand, specifically provided that those files belonged to Fannie Mae. Contract § V.C, FNMA Ex. 4;[5] *see also* Berger Dep., FNMA Ex. D at 122 (admitting that Fannie Mae owned the mortgage records and files). Thus, the Letter Agreement gave a benefit to Peoples, possession of the files, to which it was not already entitled under the Contract, and this benefit serves as consideration for the Agreement.

Peoples argues that this benefit was illusory. According to Peoples, "[s]ince the Landmark transaction had already collapsed prior to the execution of the Letter Agreement, Fannie Mae's 'permission' to Peoples to retain certain files in connection with that transaction was already moot by the time the Letter Agreement was executed." Peoples Mem. at 70. Peoples' assertion, however, is without merit.

Whatever the status of the Landmark transaction when the Letter Agreement was executed, there is no evidence that the prospective deal with Fidelity Bond and Mortgage Corporation was "moot" at the time that the Agreement was signed.[6] Indeed, Peoples' own evidentiary submission shows that Fidelity sent Peoples a Letter of Intent for purchase of the Portfolio on November 14, 1991, more than five months after the Letter Agreement was executed. Peoples Ex. 50; *see also* Peoples Mem. at 85–87 (describing ongoing relationship between Peoples and Fidelity for several months after the Letter Agreement was executed). We conclude that Fannie Mae's allowing Peoples to retain these files served as consideration for the Letter Agreement.

#### c. Termination without cause

 Finally, although neither party has fully discussed the issue, we find mutual consideration stemming from the fact that Fannie Mae could have terminated Peoples without cause.[7] Fannie Mae's termination of Peoples without cause would have left Peoples in the same "terminated" situation, except it would have been entitled to a fee as calculated under the Contract. Peoples would not, however, have been entitled to any of the benefits of the Letter Agreement, including the withdrawal of the termination. Thus, the benefits conferred upon Peoples by the Letter Agreement, together with Peoples' relinquishment of any claim to the fee due upon a termination without cause, furnish mutual consideration for that agreement.

#### 3. Unconscionability

Peoples argues that the Letter Agreement is unenforceable because it is unconscionable. The court disagrees.

Although the concept of unconscionability "is not susceptible of precise definition," *Stanley A. Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 810 (E.D.Pa.1981), *aff'd without opinion*, 676 F.2d 688 (3d Cir.1982); *see also,*

---

**5.** Section V.C of the Contract, FNMA Ex. 4, provides in relevant part:

All mortgage records reasonably required to document or properly service any mortgage we [Fannie Mae] own in its entirety are our property at all times. This is true whether or not the Lender developed or originated them.

. . . . .

The mortgage records belong to us [Fannie Mae]. The Lender can have possession of the mortgage records only with our approval, and the Lender is acting as our custodian. This is true whether the Lender receives the mortgage

records from an outside source or prepares them itself.

**6.** The retention of files in contemplation of a sale to Fidelity Bond was incorporated into the Letter Agreement pursuant to one of Peoples' counsel's handwritten changes to the May 24 draft of the Letter Agreement. *See* FNMA Ex. J (Showing Becker's handwritten changes).

**7.** While neither side has fully briefed this argument, it is mentioned in passing by Fannie Mae. *See* FNMA Reply Mem. at 2.

*Kennington Ltd., Inc. v. Wolgin,* Civil Action No. 89–80, 1989 WL 55395 at * 7 (E.D.Pa. May 23, 1989) (precise definition of unconscionability is difficult to ascertain from Pennsylvania case law), Pennsylvania courts have repeatedly stated that:

> Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

*Witmer v. Exxon Corp.,* 495 Pa. 540, 551, 434 A.2d 1222 (1981) (emphasis omitted) (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)); *accord, Denlinger, Inc. v. Dendler,* 415 Pa.Super. 164, 608 A.2d 1061, 1068 (1992); *Wagner v. Estate of Rummel,* 391 Pa.Super. 555, 571 A.2d 1055, 1059 (1990), *appeal denied,* 527 Pa. 588, 588 A.2d 510 (1991); *Kennington,* 1989 WL 55395 at * 7; *Melso v. Texaco, Inc.,* 532 F.Supp. 1280, 1295–96 (E.D.Pa.), *aff'd without opinion,* 696 F.2d 983 (3d Cir.1982); *Stanley A. Klopp,* 510 F.Supp. at 810; 14 Williston on Contracts § 1632A (3d ed. 1972).

██ A party claiming that an agreement is unconscionable may be found to have had an "absence of meaningful choice" when it executed the agreement in either of two circumstances. As Judge Joseph S. Lord, III, of this court has explained:

> One variety of unconscionable contract is very much like contracts of adhesion.... It usually involves a party whose circumstances, perhaps his unworldliness or ignorance, when compared with the circumstances of the other party, make his knowing assent to the fine-print terms fictional.... Another species concerns what is basically economic duress. In the absence of a general mandate to review the adequacy of consideration, there has sometimes been a review of the economic positions of the parties and a finding that the position of one was so vulnerable as to make him the victim of a grossly unequal bargain.

*In re Elkins–Dell Manufacturing Co.,* 253 F.Supp. 864, 871 (E.D.Pa.1966) (citing 3 Corbin, Contracts § 559, at pp. 270–71 (1960)).

██ In neither of the above-described senses did Peoples suffer from an "absence of meaningful choice." The first of the above-described species of unconscionability arises in situations "where a sophisticated, knowing party was dictating terms to an unsophisticated party placing the latter in a perilous position without his knowledge." *Kennington,* 1989 WL 55395 at * 8 (citing *Germantown Manufacturing Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138, 145–148 (1985)). In contrast, Peoples is a sophisticated business and was represented by counsel at all stages of negotiation and execution of the letter agreement. *See Kennington* at * 8 (rejecting unconscionability claim made by "sophisticated businessperson, well accustomed to dealing in millions of dollars"). As to the second type of unconscionability, arising out of "economic duress," we have already determined as a matter of law that such duress was not present in the instant case. *See supra* Section IV.A.1.

██ We conclude that the Letter Agreement is not unconscionable. It may well be that Peoples "entered into a less than ideal business arrangement. Pennsylvania contract law, however, is not in place to act as an insurance policy for those who suffer some sort of loss as a result of a contractual relations.... [T]he freedom to contract includes the freedom to enter into bad deals." *Kennington Ltd., Inc. v. Wolgin,* Civil Action No. 89–80, 1989 WL 55395 at *8 (E.D.Pa. May 23, 1989).

### B. Peoples' Claims Against Fannie Mae

Having determined that the Letter Agreement is enforceable, we proceed to consider each of Peoples' claims against Fannie Mae. Peoples complaint against Fannie Mae alleges: (1) breach of the Contract (Count I); (2) conversion of the servicing income from the Servicing Portfolio (Count II); (3) intentional interference with contractual agreement (Count III); (4) intentional interference with prospective advantage (Count IV); and (5) negligence (Count VI). Peoples asks the court to declare that the termination provisions of the Contract are unconscionable, void and unenforceable, and that the right to service the loans sold by Peoples to Fannie Mae belongs to Peoples (Count VII). Finally, Peoples asks the court to enjoin Fannie

Mae from selling the Servicing Portfolio (Count VIII).[8]

### 1. Breach of the Contract

In Count I of its complaint, Peoples alleges that Fannie Mae breached the Contract when it terminated the Contract's selling and servicing provisions on May 17, 1991. In particular, Peoples asserts that Fannie Mae breached the Contract by terminating Peoples for cause when in fact no cause existed. Peoples argument, however, cannot stand in light of the existence and enforceability of the Letter Agreement.

■ The Letter Agreement states that it is a "resolution of all disputed issues" between Fannie Mae and Peoples, and that it "represent[s] the full agreement" reached by the parties. Fannie Mae Ex. E. Because the Letter Agreement, and not the Contract, defines Peoples' contractual rights against Fannie Mae, Peoples cannot maintain a claim for breach of the Contract. All claims for breach of the Contract were rendered moot when the Letter Agreement was executed. Indeed, the Letter Agreement states that the termination was "for cause," specifically negating Peoples' claim that the termination was actually without cause. Accordingly, Count I must be dismissed.[9]

### 2. Conversion of servicing income from the Servicing Portfolio

■ Count II of Peoples' complaint attempts to state a claim for conversion of the servicing income from the Servicing Portfolio. Under Pennsylvania law, conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 451, 197 A.2d 721, 726 (1964); *accord, Bank of Landisburg v. Burruss,* 362 Pa.Super. 317, 524 A.2d 896,

898 (1987). The party claiming conversion must have had an immediate right to possession of the property at the time it was allegedly converted. *Bank of Landisburg,* 524 A.2d at 898 (citing *Potts Run Coal Co. v. Benjamin Coal Co.,* 285 Pa.Super. 128, 135, 426 A.2d 1175, 1178 (1981)). Money may be the subject of a conversion. *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (1987) (citing *Pearl Assurance Co. v. National Ins. Agency,* 151 Pa.Super. 146, 156, 30 A.2d 333, 337 (1943)).

In order to understand Peoples' conversion claim, it is necessary to appreciate the way in which Peoples allegedly garnered servicing income under the terms of the Contract. When Fannie Mae purchased loans from Peoples pursuant to the Contract, it contracted to receive a fixed "pass-through" rate or "required net yield" of return from each loan payment made to Peoples by the borrower. This "pass-through" or "net yield" payment was made to Fannie Mae by Peoples, the servicer of the loan. Complaint ¶ 101. The "pass-through" rate is less than the full amount of principal and interest due each month from the borrower, Complaint ¶ 102, and the difference between the principal and interest paid by the borrower to Peoples, and the "pass-through" rate paid by Peoples to Fannie Mae represented the servicing fee to which Peoples was entitled under the Contract, Complaint ¶ 103.

The Complaint alleges that the "servicing fee for each loan serviced by Peoples belongs to Peoples, not Fannie Mae." Complaint ¶ 105. Because Peoples has not received any servicing income from the Portfolio since it was seized by Fannie Mae in May 1991, Peoples concludes that Fannie Mae has "converted the servicing income from the Peoples servicing portfolio to their own use and benefit." Complaint ¶ 106. In short, Peoples contends that it owns the income acquired by servicing the Portfolio, and that Fannie Mae

---

8. Count V was previously dismissed without prejudice by stipulation of the parties, pursuant to Fed.R.Civ.P. 41(a)(1)(ii). *See* Stipulation of Dismissal (docketed at # 42).

9. In its Memorandum of Law, *see* Peoples Mem. at 76–81, Peoples asserts that Fannie Mae has breached the Letter Agreement. Because we

have determined that the Letter Agreement is enforceable, it would be possible to bring claims for its breach. However, Peoples has brought no such claim in the instant case, choosing instead to argue that the Letter Agreement is unenforceable.

has converted that income by taking it away from Peoples.

Peoples' argument is belied by the undisputed facts and the plain language of the Letter Agreement. The Complaint's allegation that the "servicing fee for each loan serviced by Peoples belongs to Peoples, not Fannie Mae," Complaint ¶ 105, is beside the point, since none of the loans in the Portfolio are "serviced by Peoples," nor have they been serviced by Peoples since May 1991, having instead been "subserviced" for Fannie Mae by Meridian Mortgage Corporation.

If Peoples means to claim that it owns the servicing fee for each loan in the Portfolio, irrespective of who actually does the servicing, this claim must fall in light of the plain language of the Letter Agreement, which states: "Except as specifically provided in this letter, Fannie Mae has all rights to the Servicing Portfolio." FNMA Ex. E. Thus, when Peoples executed the Letter Agreement, it gave up all rights to the servicing income, except insofar as such rights may be specifically provided by that agreement.

■ Because any rights Peoples might have to servicing income are defined by the terms of the Letter Agreement, which we have determined to be an enforceable contract, Peoples cannot sue in tort for conversion of that income. Instead, any rights to servicing income granted to Peoples by the Letter Agreement would properly be protected by a contract action seeking enforcement of the Letter Agreement or damages for its breach. As Judge Pollak of this court has explained:

> While it is true that the mere existence of a contract between parties does not foreclose the possibility of a tort action arising

between them, it does not follow that a plaintiff should be allowed to sue in tort for damages arising out of a breach of contract. To hold otherwise would be to blur one reasonably bright line between contract and tort, and hence introduce needless confusion into the judicial process, a step that Pennsylvania's state and federal courts alike have refused to take.

*Stout v. Peugeot Motors of America,* 662 F.Supp. 1016, 1018 (E.D.Pa.1986) (citing, *Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc.,* 344 Pa.Super. 367, 496 A.2d 840, 843–44 (1985); *Glazer v. Chandler,* 414 Pa. 304, 308 & n. 1, 200 A.2d 416 (1964); *Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.,* 457 F.Supp. 1158, 1165–66 (E.D.Pa.1978)); *accord, Montgomery v. Federal Insurance Co.,* 836 F.Supp. 292, 301–302 (E.D.Pa.1993) (dismissing conversion claim because of, *inter alia,* the "firmly accepted ... doctrine that an action for conversion will not lie where damages asserted are essentially damages for breach of contract"); *Neyer, Tiseo & Hindo, Ltd. v. Russell,* Civil Action No. 92–2983, 1993 WL 53579 at *3–4 (E.D.Pa. March 2, 1993) (dismissing conversion claim); *Browne v. Maxfield,* 663 F.Supp. 1193, 1201 (E.D.Pa.1987) ("Pennsylvania courts, state and federal, have consistently rejected tort remedies for conduct that is remediable as a breach of contract."); *see also Northcraft v. Edward C. Michener Associates, Inc.,* 319 Pa.Super. 432, 447, 466 A.2d 620, 628 (1983) (action for conversion must be limited to chattels of existing nature, i.e., those whose existence is ascertainable by some concrete proof; in absence of such proof, circumstances are more amenable to cause of action for breach of contract).[10] We would be particularly loathe

---

10. One opinion of the Pennsylvania Superior Court does recognize a cause of action for conversion where money is due under the terms of a contractual agreement. See *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112 (1987). The *Shonberger* court, however, did not distinguish or discuss the above-cited line of contrary cases. Moreover, *Shonberger* is distinguishable from the instant case. In *Shonberger,* the plaintiff, a supplier of clothing, entered into a consignment agreement with the defendant, the terms of which were that defendant would sell plaintiff's goods through his stores, keep a percentage of the proceeds, and then remit the remainder to

plaintiff. Plaintiff sued for conversion when defendant ceased making payments, *id.,* 530 A.2d at 113, and the Superior Court allowed the conversion claim to proceed.

*Shonberger* is distinguished from the instant case, and from the above-cited cases, by the fact that the contract at issue in that case was a *consignment* agreement. The nature of a consignment agreement is that title to the goods under consignment remains with the consignor, and does not pass until the time of sale, at which time title passes directly to the purchaser. *See, e.g.,* Blacks Law Dictionary at 278 (5th ed. 1979)

to blur the line between contract and tort actions in the instant case, where the Complaint's conversion claim does not even mention the Letter Agreement upon which any rights of Peoples to servicing income must rest. Thus, Count II of the Complaint must be dismissed.

### 3. Intentional interference with contractual relations

Count III of Peoples' complaint alleges that Fannie Mae intentionally interfered with a contractual agreement between Peoples and Landmark Savings Bank ("Landmark") for the purchase by Landmark of a portion of the servicing rights for the Servicing Portfolio. Under the undisputed evidence, Count III must be dismissed.

The record reveals that Landmark and Peoples entered into a transaction in April 1991, to be completed by the end of May 1991, whereby Landmark would purchase from Peoples the servicing rights to approximately 320 loans. Bollman Dep., Peoples Ex. 51 at 14–15, 21–23; Peoples Ex. 52 (Landmark letter of intent). The Letter Agreement granted Peoples the right to attempt this sale to Landmark, FNMA Ex. E at ¶¶ 2, 4, and Fannie Mae's approval of the transaction had been obtained, Berger Dep., Peoples Ex. 14 at 299–300; Loan Servicing Purchase and Sale Agreement, Peoples Ex. 53 at 29. Shortly after Landmark learned that Fannie Mae had removed the Servicing Portfolio from Peoples, Landmark notified Peoples that it was withdrawing its letter of intent to purchase. Bollman Dep., Peoples Ex. 51 at 29.

Peoples alleges that Fannie Mae intentionally interfered with the Landmark contract, and caused Landmark to back out of the deal. According to Peoples, this interference took two forms: (1) Fannie Mae allegedly made excessive demands that Peoples repurchase loans previously sold by Peoples to Fannie Mae;[11] and (2) Fannie Mae allegedly terminated the Servicing Contract for cause when there was actually no cause for termination.

Pennsylvania courts analyze claims for intentional interference with contract under Section 766 of the Restatement (Second) of Torts. *Windsor Securities, Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir.1993) (citing, *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 429–31, 393 A.2d 1175, 1181–83 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1386 (3d Cir.1991)); *Geofreeze Corp. v. C. Hannah Constr. Co.*, 588 F.Supp. 1341, 1344 (E.D.Pa. 1984). Section 766 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contact, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Section 766 "addresses disruptions caused by an act directed not at the plaintiff [Peoples], but at a third person [Landmark]: the defendant causes the promisor [Land-

---

(defining "consign" as: "To deposit with another to be sold . . ., whereby title does not pass until there is action of consignee indicating sale."); *Taylor v. Wachtler*, 825 F.Supp. 95, 103 (E.D.Pa. 1993); *Kalamazoo Stationery Co. v. Sabold–Herb Co.*, 298 Pa. 530, 533, 148 A. 865, 866 (1930). Thus, the *Shonberger* plaintiff had an underlying property interest in the goods under consignment, distinct from the contractual agreement. When the defendant sold plaintiff's goods, and refused to remit the proceeds of the sales, he directly converted plaintiff's titled property interest in the goods to his own use. In the instant case, in contrast to the situation in *Shonberger*, Peoples' only interest in servicing income was that specifically granted by the Letter Agreement. *See also, Montgomery*, 836 F.Supp. at 300 (distin-

guishing *Shonberger* and refusing to allow a conversion claim where money is due under the terms of a contractual agreement because "[h]ere, the contract provides for the payment of certain claims under specified circumstances. Thus, unlike in *Shonberger*, plaintiff's right to payment is not absolute.").

11. Section IV.B of the Contract permitted Fannie Mae, for specified reasons, to require a lender to repurchase from Fannie Mae a mortgage loan that the lender had previously sold to Fannie Mae. *See* Peoples Ex. 2. In the Letter Agreement, Fannie Mae retained its right to demand that Peoples repurchase loans. *See* FNMA Ex. E at ¶¶ 4, 5, 6.

mark] to breach its contract with the plaintiff [Peoples]." *Windsor Securities*, 986 F.2d at 660. It is undisputed that all of Fannie Mae's acts allegedly disrupting Peoples' deal with Landmark, the allegedly unlawful termination of the Contract and the allegedly excessive loan repurchase requests, were directed at *Peoples*, not at Landmark. Therefore, Peoples cannot make out a claim against Fannie Mae under § 766, even if Fannie Mae's conduct was intended to and did cause Landmark's failure to perform. *Windsor Securities*, 986 F.2d at 659–60.

Section 766A of the Restatement (Second) of Torts covers situations where, as here, the defendant's alleged tortious interference is directed toward the plaintiff, rather than toward a third person with whom the plaintiff has a contractual relation. Section 766A provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

The Pennsylvania Supreme Court has not adopted § 766A. *See Windsor Securities*, 986 F.2d at 659–60.[12] The third circuit has stated that it "is far from clear" that the Pennsylvania Supreme Court would adopt § 766A, *id.*, 986 F.2d at 661, has criticized that section, *id.*, 986 F.2d at 659–63, and has "counsel[ed] some caution in expanding tortious interference liability" to include the behavior that section describes, *id.* at 662–63. The third circuit did not finally reach the issue of whether § 766A would be adopted by the Pennsylvania Supreme Court, however, because it found that even if that section were adopted the plaintiff had not made out a claim. *Id.*, 986 F.2d at 663–65; *see also Stepanuk v. State Farm Mutual Automobile Insurance Co.*, Civil Action No. 92–6095, 1993 WL 114036 at *10–11 (E.D.Pa. April 14, 1993) (describing the *Windsor Securities* court's criticism of § 766A and finding that the plaintiff could not prevail under that section even if it was the law of Pennsylvania); *Stepanuk v. State Farm Mutual Automobile Insurance Co.*, Civil Action No. 92–6095, 1993 WL 166748 at *1 (E.D.Pa. May 14, 1993) (same, on motion for reconsideration).

■ Given the third circuit's negative appraisal of § 766A, this court would be hesitant to adopt it as an expression of Pennsylvania law. Like the *Windsor Securities* court, however, we need not decide if § 766A would be adopted by the Pennsylvania Supreme Court. Even if Pennsylvania were to adopt § 766A, Fannie Mae is not liable under that section. Its conduct either did not cause Landmark to withdraw from the deal, or was not "improper" within the meaning of § 766A.

The undisputed evidence shows that Fannie Mae's allegedly excessive loan repurchase requests had nothing to do with Landmark's withdrawal from the deal. Deposition testimony of Jay Berger and of John Bollman, head of Landmark's secondary marketing and servicing operation, shows that Landmark decided to withdraw from the deal when it was notified by Peoples, during the week of May 20, 1991, that Fannie Mae was removing the servicing from Peoples. Bollman Dep., Peoples Ex. 51 at 24, 29–30, 53; Berger Dep., FNMA Ex. D at 222. All of the allegedly excessive loan repurchase requests were made *after* May 30, 1991. Complaint ¶ 40. Thus, it is clear that the loan repurchase requests had nothing to do with Landmark's withdrawal, since they all came after the decision to withdraw had been made.[13]

On the other hand, it is undisputed that Fannie Mae's termination of the Contract with Peoples *was* a factor in Landmark's decision to withdraw. Bollman Dep., Peoples Ex. 51 at 29–30, 53. However, Fannie Mae's

---

**12.** The third circuit has noted that while several federal district courts "have implicitly assumed" that Pennsylvania would adopt § 766A, "[n]one of these cases cited a Pennsylvania case adopting § 766A. Nor did any predict that the Pennsylvania Supreme Court would recognize a cause of action under § 766A." *Windsor Securities*, 986 F.2d at 660, n. 7 (citing federal district court cases).

**13.** Peoples apparently recognizes this and has not pressed this issue in its brief.

termination of the Contract cannot be considered "improper" in the sense required for liability under § 766A, for in the Letter Agreement Peoples acknowledges that the termination of the Contract was "for cause." FNMA Ex. E. Thus, Peoples cannot now claim that the termination was an "improper" action subjecting Fannie Mae to liability under § 766A.

Even in the absence of the Letter Agreement, Fannie Mae's termination of the contract "for cause" when there allegedly was none is not the kind of action envisioned as "improper" under § 766A. *Windsor Securities*, 986 F.2d at 663–665 (breach of contract does not constitute the type of "improper" conduct required to make out a claim under § 766A). Where "the allegations and evidence only disclose that defendant breached his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action." *Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964); *accord, Adler, Barish*, 482 Pa. at 430 n. 13, 393 A.2d at 1182 n. 13; *Windsor Securities*, 986 F.2d at 663–665; Prosser & Keaton, *The Law of Torts* § 129, at 990 (5th ed. 1984). Accordingly, Count III will be dismissed.

### *4. Intentional interference with prospective contractual relation*

Count IV of Peoples' complaint alleges that Fannie Mae intentionally interfered with a prospective contractual relation by causing Fidelity Bond and Mortgage Corporation ("Fidelity") to withdraw from negotiations with Peoples for the purchase of the servicing.[14] Peoples avers that Fannie Mae's "initiating excessive and unreasonable loan repurchase demands" caused Fidelity "not to enter into an agreement with Peoples to purchase the Peoples Servicing Portfolio." Complaint ¶ 134.

Under Pennsylvania law, a plaintiff asserting intentional interference with prospective contractual relations must prove the following elements: "(1) a prospective contractual relationship; (2) the purpose or intent to harm plaintiff by preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) occurrence of actual damage." *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir.1991); *accord, Silver v. Mendel*, 894 F.2d 598, 601–02 (3d Cir.) (citing *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979)), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). Peoples must also establish that there is a reasonable likelihood that the transaction would have been completed but for Fannie Mae's interference. *Thompson Coal Co.*, 488 Pa. at 209–10, 412 A.2d at 471; *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 898 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Posner v. Lankenau Hospital*, 645 F.Supp. 1102, 1111 (E.D.Pa. 1986).[15]

---

**14.** The Letter Agreement gave Peoples the right to attempt to transfer the servicing to Fidelity. *See* FNMA Ex. E at ¶ 2.

**15.** Section 766B of the Restatement (Second) of Torts addresses intentional interference with prospective contractual relations. That section provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Section 766B provides, in subsections (a) and (b), respectively, for situations where the interference with prospective contract is directed toward a third person or toward the plaintiff. Thus § 766B(a) and § 766B(b) are analogous to the Restatement's treatment in § 766 and § 766A, respectively, of intentional interference with an existing contract.

Section 766B has not been adopted *in toto* by the Pennsylvania Supreme Court. *Windsor Securities*, 986 F.2d at 661; *Advent Systems*, 925 F.2d at 673; *Silver v. Mendel*, 894 F.2d at 601–04. In particular, Pennsylvania law favors an analysis of whether the defendant's interference was "privileged," while the Restatement asks if the conduct

Deposition testimony of Fidelity's President, James Dougherty, explicitly addresses the role Fannie Mae played in Fidelity's decision to withdraw from negotiations with Peoples:

Q: Did Fannie Mae have any impact on your decision not to go through with the deal?

. . . . .

A: I don't think Fannie Mae—Fannie Mae had no—you know, obviously in the back of your mind you are thinking here's our major customer and our main customer and you take that into consideration, obviously, when you are doing these types of deals. *But they [Fannie Mae] put no pressure on us either way to do or not to do this deal.*

. . . . .

Q: *Did Fannie Mae do anything or not do anything that impacted on your decision not to go through with the deal?*

A: *No.* I might have had a conversation with Phil Nichols about that, us doing this deal. I might have called him, and I don't recall, though. Something tells me I did when I think a little bit about it....

Q: *Did Mr. Nichols say anything to you that had any impact on whether or not Fidelity would do or not do this deal?*

A: *No, he did not.*

Dougherty Dep., FNMA Ex. 6 at 48–50 (emphasis added).

■ Dougherty's deposition testimony makes it clear beyond doubt that nothing Fannie Mae did or said *to Fidelity* had anything to do with Fidelity's decision not to go forward with the deal. While Fannie Mae's position in the market as Fidelity's major customer may have influenced Fidelity's decision, such indirect influence cannot be taken to be the type of "purpose or intent to harm" Peoples, *Advent Systems, supra,* needed to make out a claim for intentional interference with a prospective contract. *See also* Harper, James & Gray, *The Law of Torts* § 6.13, at 354 (2d ed. 1986) ("One who causes loss of business ... to another merely by engaging in a business ... in good faith is not liable to the other for loss caused, though he knows that the loss will result.") (footnote and citations omitted); Restatement (Second) of Torts § 766 comment *l* (discussing inducement by refusal to deal); Speiser, Krause & Gans, *The American Law of Torts* § 31:50, at 1298–99 & n. 17 (1991) (same); Prosser & Keaton, *The Law of Torts* § 130, at 1012–13 (5th ed. 1984).

While Fannie Mae's conduct *toward Fidelity* does not make out a claim for intentional interference with prospective advantage, Peoples asserts that Fannie Mae's conduct *toward Peoples,* specifically Fannie Mae's allegedly unreasonable loan repurchase requests, caused Fidelity to back out of the prospective deal. Because this claim alleges conduct directed at Peoples, rather than at Fidelity, it is analogous to an action brought for intentional interference with an existing contract under Restatement (Second) of Torts § 766A. *See supra* Section IV.B.3.

■ A "similar approach" should be taken for analyzing claims of intentional interference with prospective contract as is taken for claims of intentional interference with an existing contract. *Advent Systems,* 925 F.2d at 673; *see also Glenn v. Point Park College,* 441 Pa. 474, 478, 272 A.2d 895 (1971); Restatement (Second) of Torts § 766B, Comment e; Harper, James & Gray, *The Law of Torts* § 6.11, at 343 (2d ed. 1986); Prosser & Keaton, *The Law of Torts* § 130, at 1005, 1008 (5th ed. 1984). For reasons already described, *see supra* Section IV.B.3, we would hesitate to predict that the Pennsylvania Supreme Court would adopt § 766A as the law of Pennsylvania. We would be equally or more reluctant to predict that the analogous provisions for intentional interference with a prospective contractual relationship, when the alleged interference is directed toward the plaintiff, rather than toward a third party with whom the plaintiff is attempting to establish a contract, would be adopted by the Pennsylvania Supreme Court. *See* Prosser & Keaton, *The Law of Torts* § 129, at 978 (5th ed. 1984) ("more latitude is generally allowed" for interference with pro-

was "proper." *See, Advent Systems, supra; Sil-* *ver, supra.*

spective contract than for interference with existing contract); Harper, James & Gray, *The Law of Torts* § 6.13, at 354 (2d ed. 1986) (same). As was the case with our consideration of § 766A, however, we need not decide if the Pennsylvania Supreme Court would allow a claim of intentional interference with prospective contract when the interference is directed toward the plaintiff rather than toward a third person. We find that, even if such a cause of action is allowed, Peoples cannot prevail under the undisputed facts.

Fidelity's President, James Dougherty, testified that Fidelity knew there were outstanding repurchase requests at the time that it entered into the letter of intent to purchase the Portfolio servicing rights from Peoples. Dougherty Dep., FNMA Ex. M at 77. When Fannie Mae's counsel asked Dougherty what impact, if any, the existence of such outstanding repurchase requests had on Fidelity's decision to withdraw from negotiations for the purchasing, he replied:

> *It had no impact because we knew that going in.* I mean it was something that impacted our due diligence in the nature and extent of the work we wanted to do.... So it played into that scenario, but *it didn't impact us walking away from it.*

Dougherty Dep., FNMA Ex. M at 77–78 (emphasis added). When Dougherty was later asked by Peoples counsel if "Fidelity's concern [was] greater because of the repurchase demands," he responded: "No, no necessarily. We felt we could isolate that through due diligence.... So, no, I don't think that came into play." Dougherty Dep., FNMA Ex. 6 at 93. Thus, the undisputed evidence shows that Fannie Mae's loan repurchase requests did not cause Fidelity to back out of its prospective contract with Peoples.

■ Even if Fannie Mae's repurchase requests had caused Fidelity to walk away, they could not give rise to a cause of action for intentional interference with prospective

contract, because Fannie Mae's actions were not taken in "the absence of privilege or justification." *Advent Systems,* 925 F.2d at 673.

The Pennsylvania Supreme Court has stated that:

> The absence of privilege or justification ... is closely related to the element of intent. As stated by Harper & James, *The Law of Torts,* § 6.11, at 513–14: "... where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability." What is or is not privileged conduct in a given situation is not susceptible of precise definition. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged"....

*Glenn,* 441 Pa. at 482, 272 A.2d at 899; *accord, Silver,* 894 F.2d at 603, n. 7.

The Letter Agreement gave Fannie Mae the right to seek loan repurchases from Peoples. FNMA Ex. E at ¶¶ 4, 5. Thus, when Fannie Mae sought repurchases, and by so doing allegedly interfered with Peoples' prospective contract with Fidelity, it was seeking to enforce a right specifically granted to it by the Letter Agreement. Such an action is certainly "sanctioned by the 'rules of the game' which society has adopted," and is "socially acceptable conduct." *Glenn, supra; Silver, supra; accord,* 45 Am.Jur.2d, Interference, § 23 (enforcing one's own valid contract does not constitute unjustifiable interference with another's contract); Restatement (Second) of Torts § 773. Therefore, Fannie Mae's action was privileged.[16]

---

**16.** Peoples acknowledges that Fannie Mae had a right under the Letter Agreement to request repurchases, but argues that the number and timing of Fannie Mae's repurchase requests breached an implied covenant of good faith and fair dealing. *See* Peoples Mem. at 79. Leaving aside the issue of whether Fannie Mae's actions amounted to a breach of an implied covenant, the proper forum for such allegations is through a claim for breach of the Letter Agreement, rather than through a tort action for intentional interference with prospective contract. *See supra* Section IV.B.3.

Count IV also asserts that certain actions by Meridian amounted to intentional interference with the prospective contract between Peoples and Fidelity. Peoples alleges that Meridian's "failure to provide timely and complete information concerning the servicing Portfolio" caused Fidelity to decline to purchase the servicing. Complaint ¶ 134. Thus, Meridian's actions were directed toward Fidelity, rather than toward Peoples, and so this part of Count IV is analogous to the well-established § 766, rather than to the more questionable § 766A. Assuming without deciding that Fannie Mae can be held vicariously liable for Meridian's actions, we find that there is no liability because the evidence is insufficient to go to the jury on the question of Meridian's intent.

Fidelity's president testified that:

for numerous and various reasons, the transaction was never carried through.... [W]e couldn't get satisfied with some of the underwriting.... [T]here was some—a lot of timing problems or problems getting some information from Meridian. There were just a whole host of problems.... Fidelity Bond was in a sale process at the time. So it was just something that just— for whatever reason couldn't take place.

Dougherty Dep., FNMA Ex. 6 at 10–11; *see also, id.* at 14. Thus, it appears that Fidelity's "problems getting some information from Meridian" did contribute to its decision to back out of its prospective deal with Peoples.

Fidelity's president's description of his relationship with Meridian, however, belies any claim by Peoples that Meridian's interference was intentional. Dougherty testified concerning a letter he had sent to Jay Berger:

Q: And the last paragraph [of a letter from Dougherty to Jay Berger] reads, "Meridian has been very cooperative and they are doing their best to produce this information. However, we have requested a lot of information from them and they had some problems producing the reports." What reports are you referring to?

A: I would assume the investor accounting reports.... Basically they had the portfolio, and this is all the information

we needed to be produced from the portfolio in order to do our due diligence.

Q: All right. What was your understanding, if any, as to why they were—there were problems producing the reports?

A: From memory, Meridian was working like, I don't know, they had mandatory overtime requirements, they were working six and seven days a week, they were obviously busy in-house, and I don't know if they were digesting some growth problems that they had experienced, they were getting all that information together as well as this is a burden you place on any company. I mean it takes time to produce this information. You know, you are looking at $137 million portfolio, probably a couple of thousand loans. It takes time to get this information together.

Q: To your knowledge, was anyone at Meridian refusing to provide information?

A: No. No one—they were very cooperative, as I said in the letter.

Dougherty Dep., FNMA Ex. 6 at 59–60.

"It must be emphasized that the tort [of intentional interference with prospective contract] is an intentional one: the actor is acting as he does *for the purpose of causing harm* to the plaintiff." *Glenn,* 441 Pa. at 481, 272 A.2d at 899 (emphasis in original). Negligent action that interferes with another's ability to contract is not enough. Instead the conduct must have been "intended to interrupt negotiations or prevent the consummation of a contract." *Id.* (quoting Harper & James, *The Law of Torts,* § 6.11 at 512 (1956)); *accord, Aikens v. Baltimore & Ohio R. Co.,* 348 Pa.Super. 17, 501 A.2d 277, 278–79 (1985) (no liability for negligent interference with contract, absent physical harm); Restatement (Second) of Torts § 766C (same); Speiser, Krause & Gans, *The American Law of Torts* § 31:43 (1991) ("crystal clear" that there is no tort action for negligent interference with existing or prospective contract). Given Dougherty's description of Meridian's conduct, a jury could not reasonably find that Meridian acted with the intent

to disrupt the prospective deal between Peoples and Fidelity.

Peoples, apparently recognizing the damage Dougherty's testimony does to its claim, argues that the court should discount that testimony because it "is as much as can be expected from a non-party witness who presides over a company where Fannie Mae controls loans representing up to 65% of the value of his company's own servicing portfolio and over 50% of his company's servicing fees." Peoples Mem. at 87 (citing Dougherty Dep., FNMA Ex. 6 at 97, 102–03). In effect, Peoples seeks to impeach the credibility of Dougherty's testimony by intimating that he might be afraid to testify against Fannie Mae.

▮ It is true that questions of witness credibility should be left to the finder of fact. *See, e.g., Agosto v. Immigration & Naturalization Service,* 436 U.S. 748, 756–57, 98 S.Ct. 2081, 2086–87, 56 L.Ed.2d 677 (1978); *Block v. Biddle,* 36 F.R.D. 426, 429 (W.D.Pa. 1965). However,

> [t]he fact that a court may not properly resolve credibility issues on a motion for summary judgment does not mean that a responding party can overcome a well-supported motion simply by challenging the credibility of the movant's witnesses, without any further showing on his own part. Summary judgment cannot be avoided where all that the responding party can hope for is to induce the movant to discredit his affidavits on cross-examination during trial. Rather, the responding party must make an affirmative showing of facts which will entitle him to judgment or refute the proof of the moving party and thus demonstrate that there is a genuine triable issue concerning the credibility of the affiant.

28 Fed.Proc., L.Ed. § 62:564 (1984) (citing cases; footnotes omitted).

Similarly here, Peoples cannot create a genuine issue of fact simply by presenting speculative evidence of bias or interest that it hopes would impeach Dougherty's testimony at trial. Instead, Peoples must produce some evidence that would call into question Dougherty's testimony that Meridian was "very cooperative and . . . doing their best to produce" the information. Absent such affirmative evidence, this court cannot find a genuine issue of material fact as to Peoples' claim that Fidelity's "problems getting some information from Meridian" were the result of Meridian's intent to disrupt Peoples prospective contract. Count IV must be dismissed.

### 5. Negligence

Count VI of Peoples' Complaint attempts to recover damages from Fannie Mae based on alleged negligent mismanagement by Meridian in connection with Meridian's subservicing of the Servicing Portfolio. Peoples alleges that Meridian has negligently serviced the Portfolio and that, as a result, Peoples has lost business opportunities and has suffered loss from the alleged declination in value of the Servicing Portfolio. Peoples argues that "under the laws of agency, Fannie Mae is . . . responsible for the [negligent] acts of Meridian in its capacity as subservicer of the Servicing Portfolio." Peoples Mem. at 88 (citing *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1276 (3d Cir.1979)). We will assume without deciding that Fannie Mae would be vicariously liable for Meridian's tortious acts in this context.

▮ At the heart of Peoples' argument is the assumption that the Servicing Portfolio is Peoples' property. This assumption is unfounded. The Letter Agreement states that "Fannie Mae has all rights to the Servicing Portfolio," except for those rights that are "specifically provided to Peoples by that Agreement." Thus, Peoples' interest in the Portfolio is a contractual interest, as defined by the terms of the Letter Agreement, rather than a property interest, and any losses suffered by Peoples in regard to the Portfolio are economic, not proprietary. "The general rule of law is that economic losses may not be recovered in tort (negligence) absent physical injury or property damage." *Spivack v. Berks Ridge Corp.,* 402 Pa.Super. 73, 586 A.2d 402, 405 (1990) (citing *Aikens v. Baltimore & Ohio R. Co.,* 348 Pa.Super. 17, 501 A.2d 277 (1985); *Hammermill Paper Co. v. C.T. Main Construction, Inc.,* 662 F.Supp. 816 (1987)); *accord,* Harper, James & Gray,

*The Law of Torts* §§ 6.10, 25.18A–D (2d ed. 1986); Prosser & Keaton, *The Law of Torts* § 129, at 997–1002 (5th ed. 1984). Therefore, Peoples' negligence claims against Fannie Mae must be dismissed.

This analysis is confirmed by consideration of the rights granted to Peoples by the Letter Agreement. The Letter Agreement gives Peoples two specific rights to the Portfolio. First, Peoples was given the right to attempt, until December 1, 1991, to "complete a sale of the servicing of the mortgages in the Servicing Portfolio to an acceptable Fannie Mae Seller/Servicer." FNMA Ex. E at ¶ 4. Peoples would receive the proceeds of that sale, if any remained upon reconciliation, as set forth in the Letter Agreement. FNMA Ex. E at ¶ 4; Reich Dep., FNMA Ex. C at 63, 65–66. Second, Peoples was given the right to receive certain "excess" servicing proceeds, that is proceeds over and above Meridian's subservicing fee together with amounts owed Fannie Mae by Peoples, until the servicing was sold. FNMA Ex. E at ¶ 5. Neither of these rights will support a negligence claim against Fannie Mae.

■■■■ As we have explained in detail above, when, as here, the rights between the parties are specified by their contractual relations, courts will generally not allow a plaintiff to sue in tort for damages arising out of a breach of that contract. *See supra* Sections IV.B.2–4. Peoples' claim, in essence, is that Meridian's negligence, as imputed to Fannie Mae caused a diminution in value of the rights granted to Peoples by the Letter Agreement. Such a claim is properly brought, if at all, as a claim for breach of the Letter Agreement.

More concretely, given the express provisions of the Letter Agreement, Peoples allegations reduce to claims that Meridian's negligence, as imputed to Fannie Mae, reduced the value of Peoples right to sell the servicing rights, made that sale more difficult or impossible, *see* Letter Agreement ¶ 4, and diminished the possibility that Peoples would receive any "excess" servicing fees, *see* Letter Agreement ¶ 5. A negligence claim· will not lie against Fannie Mae under any of these allegations.

■■■■ To the extent that Peoples is arguing that Fannie Mae's negligence reduced the value of the Portfolio's servicing and made the sale of that servicing more difficult, it is claiming that Fannie Mae negligently interfered with Peoples' prospective contractual relations with potential buyers of the servicing rights. As we have already explained, such a claim for *negligent* interference with prospective contract is not cognizable in Pennsylvania. *See supra*, Section IV. B.4.

■■■■ To the extent that Peoples' claim is that Fannie Mae's negligence diminished the potential value of the "excess" servicing, it is doubly barred. Because it is a claim that Fannie Mae negligently interfered with Peoples' contractual rights under the Letter Agreement, it is not cognizable in Pennsylvania for the reasons just described. Indeed, because it is a claim that Fannie Mae interfered with a contract *between itself and Peoples,* it would not be cognizable in tort even if Fannie Mae's conduct was intentional. *Rutherfoord v. Presbyterian–University Hospital,* 417 Pa.Super. 316, 331–33, 612 A.2d 500, 507–08 (1992) (citing *Glazer v. Chandler, supra; Curran v. Children's Service Center,* 396 Pa.Super. 29, 578 A.2d 8 (1990), *appeal denied,* 526 Pa. 648, 585 A.2d 468 (1991)); Prosser & Keaton, *The Law of Torts* § 129, at 990 (5th ed. 1984); Speiser, Krause & Gans, *The American Law of Torts* § 31:40 (1991).

For all of the above-described reasons, Count VI must be dismissed.

### 6. *Declaratory relief*

In Count VII, Peoples asks the court to declare that: (1) the termination provisions of the Contract are unconscionable, void and unenforceable; and (2) the right to service the loans in the Portfolio belongs to Peoples. Because of the plain language of the Letter Agreement, both of Peoples' requests for declaratory relief must be denied.

■■■■ When Peoples executed the Letter Agreement, it agreed that it "represent[ed] the full agreement reached by Fannie Mae and Peoples," and "resol[ved] . . . all disputed issues" between the parties, including the

dispute over Fannie Mae's termination of the Contract. FNMA Ex. E. Given this resolution, the court will not now hear Peoples' claim that the Contract termination clause is unconscionable, especially in light of the fact that Peoples remains suspended, rather than terminated, Berger Dep., FNMA Ex. D at 322, so that the termination provisions have no application.

Similarly, Peoples' claim that the right to service the loans in the Portfolio belongs to Peoples is belied by the plain language of the Letter Agreement, which states that Fannie Mae has all rights to the Portfolio, except those rights specifically described by the Agreement. Thus, Peoples' request for a declaration to the contrary must be denied.

### 7. Injunctive relief

In Count VIII, Peoples asks the court to enjoin Fannie Mae from selling the Servicing Portfolio because the "loss of servicing income has critically impaired Peoples' business operations." Complaint ¶ 173. Since Fannie Mae has all rights to the Portfolio apart from those left to Peoples by the Letter Agreement, and the time during which Peoples retained rights under the Letter Agreement has expired, Peoples request for injunctive relief must be denied.

### C. Fannie Mae's Counterclaims Against Peoples

Fannie Mae has brought counterclaims against Peoples. Count IV of Fannie Mae's Amended Counterclaim alleges that Peoples tortiously interfered with a contractual relationship between Fannie Mae and First Chesapeake Financial Corporation ("Chesapeake"). Specifically, Fannie Mae alleges that Peoples improperly threatened to join Chesapeake as a party to the instant lawsuit in an attempt to prevent Chesapeake from purchasing from Fannie Mae the servicing rights to the Portfolio of Fannie Mae mortgages previously serviced by Peoples.

Peoples now moves for summary judgment as to Count IV of Fannie Mae's Amended Counterclaim. Peoples' motion will be granted for two reasons: (1) we find as a matter of law that Peoples' conduct was not improper; and (2) Fannie Mae's evidence that Peoples' actions caused Chesapeake to withdraw from the deal is not sufficient to meet the requirements of Fed.R.Civ.P. 56.

### 1. Propriety of Peoples' conduct

It is undisputed that, in February, 1993, Fannie Mae entered into a Transfer of Servicing Agreement with Chesapeake, pursuant to which Chesapeake agreed to buy the Portfolio's servicing rights from Fannie Mae. See FNMA CC–Ex. C.[17] Several days later, after the Transfer of Servicing Agreement was executed but before it was effected, Peoples, through its counsel, wrote to counsel for Chesapeake and advised that: (1) Peoples was currently in litigation with Fannie Mae over the rights to the servicing; (2) Peoples understood that Chesapeake had been made generally aware of the litigation between Peoples and Fannie Mae; and (3) Peoples would be obliged to include as an additional defendant in its litigation with Fannie Mae any entity purporting to purchase the servicing from Fannie Mae. FNMA CC–Ex. A; Berger Dep., FNMA CC–Ex. B. After Peoples made its threat of litigation, Chesapeake terminated the Transfer of Servicing Agreement. FNMA CC–Ex. H (letter from Chesapeake to Fannie Mae).

Peoples admits that its threat of litigation against Chesapeake was intended to interfere with the contract between Fannie Mae and Chesapeake, and to prevent Chesapeake from going through with the deal. Berger Dep., FNMA CC–Ex. B at 384–85, 404. In order to be actionable, however, the interference must be "improper" as well as intentional. E.g., Restatement (Second) of Torts § 766; Geofreeze, 588 F.Supp. at 1344. Peoples argues that its actions were not improper because they were protected by

---

17. The Exhibits submitted in connection with Peoples' motion for summary judgment as to Count IV of the Amended Counterclaim will be referred to as "CC–Ex.," in order to distinguish them from the exhibits submitted in connection with Fannie Mae's motion for summary judgment as to Peoples' claims. Similarly, the memoranda of law submitted in connection with the counterclaim will be referred to as "CC–Mem."

Section 773 of the Restatement (Second) of Torts, which provides:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Id.* This section has been adopted by the Pennsylvania courts. *Schulman v. J.P. Morgan Investment Management,* 829 F.Supp. 782, 787 (E.D.Pa.1993); *Geofreeze,* 588 F.Supp. at 1345; *Barlow v. Brunswick Corp.,* 311 F.Supp. 209, 213 (E.D.Pa.1970); *Blum v. William Goldman Theatres, Inc.,* 69 F.Supp. 468, 470 (E.D.Pa.1946), *modified on other grounds,* 164 F.2d 192 (3d Cir.1947); *Kelly–Springfield Tire Co. v. D'Ambro,* 408 Pa.Super. 301, 311, 596 A.2d 867, 872 (1991); *Gresh v. Potter McCune Co.,* 235 Pa.Super. 537, 541, 344 A.2d 540, 542 (1975); *Bahleda v. Hankison Corp.,* 228 Pa.Super. 153, 156–57, 323 A.2d 121, 123 (1974); *Ramondo v. Pure Oil Co.,* 159 Pa.Super. 217, 224, 48 A.2d 156, 160 (1946).[18]

Given our resolution of the claims made by Peoples against Fannie Mae, *see supra* Section IV.B, it is clear as a matter of law that Peoples did not have a "legally protected interest" in the servicing rights that Fannie Mae was attempting to sell to Chesapeake. As we have repeatedly emphasized, Peoples' interest in the servicing was defined by the Letter Agreement. The Letter Agreement allowed Peoples to arrange for a sale of servicing rights to another Fannie Mae approved servicer by December 31, 1991. Fannie Mae twice conditionally extended the December 31, 1991 deadline, but on June 28, 1992 Fannie Mae declared that Peoples had failed to meet the conditions of the extensions and therefore its time to arrange a sale had expired. Accordingly, Peoples' threats to sue Chesapeake, which were made in February 1993, *see* FNMA CC–Ex. A, came some six months after any possible interest held by Peoples in the servicing had expired. Thus, if we interpret the language of § 773 as providing a defense only when a legally protected interest *actually exists,* it does not protect Peoples from liability in the instant case.

Peoples argues, however, that § 773 should be more broadly interpreted as providing a defense when the party claiming that section's protection had an "honest, good faith belief" that it had a legally protected interest. Peoples CC–Mem. at 2. Under Peoples' interpretation of § 773, the ultimate finding of whether the interest sought to be protected is *actually* legally protected is irrelevant, so long as the actor believes in good faith, at the time of interference, that its interest is legally protected. We find that Peoples' interpretation is also consistent with the language of § 773, since one could rea-

18. Our role as a federal district court sitting in diversity is to apply state law as interpreted by the Pennsylvania Supreme Court. *See Connecticut Mutual Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983). In the absence of a definitive ruling by the Pennsylvania Supreme Court, we must predict how it would rule. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 378 (3d Cir.1990). In so doing, we "must consider and give due regard to the decisions of State intermediate appellate courts as well as other state courts as indicia of how the state's highest court would decide a matter." *Ciccarelli v. Carey Canadian Mines Ltd.,* 757 F.2d 548, 553 n. 3 (3d Cir.1985) (citing *Wyman, supra; Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981)). Because the Pennsylvania intermediate courts that have considered the matter have uniformly adopted § 773 of the Restatement (Second) of Torts (or its predecessor in the First Restatement), and because the Pennsylvania Supreme Court and other Pennsylvania courts have widely relied upon the Restatement (Second) of Torts (and its predecessor) in their development and interpretation of the law of intentional interference with contract, we find that the Restatement is a good indicator of how the Pennsylvania Supreme Court would rule. *See, e.g., Adler, Barish,* 482 Pa. at 432, 393 A.2d at 1182, n. 13 (Pennsylvania courts "have repeatedly looked to the Restatement of Torts for the elements of a cause of action for intentional interference with existing contract relations."); *Geofreeze,* 588 F.Supp. at 1345 n. 6 ("[B]ecause the Pennsylvania Supreme Court has analyzed claims in accordance with [Restatement (Second) of Torts] § 766, this court predicts that Pennsylvania would also analyze claims in light of § 773.").

sonably be said to be "asserting in good faith a legally protected interest" if one believes in good faith that a legally protected interest exists.

As the citations accompanying our quotation from § 773 indicate, *see supra* text accompanying footnote 18, the Pennsylvania Superior Court and federal district courts interpreting Pennsylvania law have applied that section in eight reported decisions. In six of the eight reported decisions, the courts have found that a legally protected interest actually existed, and thus did not face the question of whether § 773 applies when the actor has only a good faith belief in the existence of that interest. *See, Schulman, supra* (defendant exercised right explicitly reserved to it by contract); *Geofreeze, supra* (defendant acted according to specific contractual provision and in accordance with business custom); *Barlow, supra* (defendant sought to protect restrictive covenant); *Kelly–Springfield Tire, supra* (refusing to dismiss complaint because it alleged that defendant did not act in good faith to preserve a legally protected interest of a client, but for the purpose of harassing plaintiff and interfering wrongfully with its efforts to sell its property); *Gresh, supra* (defendant sought to protect restrictive covenant in good faith and by proper means); *Bahleda, supra* (same).

In the other two reported decisions, one from the Superior Court and one from a federal district court, both published in 1946 and one relying upon the other, the courts found that there was no legally protected interest and concluded that § 773 did not protect the defendant, without any discussion of whether a good faith belief that the interest was legally protected would be sufficient to shield the defendant from liability. *See, Ramondo, supra; Blum, supra* (citing *Ramondo* ). Since neither of these opinions indicates that the argument now put forward by Peoples was raised, we do not find them to be particularly enlightening. Thus, the reported decisions interpreting § 773 in Pennsylvania do not provide useful guidance for our decision.

■■■ The Comments and Illustrations to the Restatement (Second) of Torts appear to be internally inconsistent on the question of whether a good faith belief in the existence of a legally protected interest is sufficient to confer the protection of § 773 on a defendant.[19] The sole Comment to § 773 states that this defense to intentional interference with contract is "of narrow scope and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." *Id.,* Comment a; *accord, Geofreeze,* 588 F.Supp. at 1345; *Gresh,* 235 Pa.Super. at 541, 344 A.2d at 542; *Blum,* 69 F.Supp. at 470. This Comment supports a narrow interpretation of § 773, since it apparently requires the actual existence of a legally protected interest as an element of the defense. Peoples' more liberal interpretation is contrary to the language of this Comment, since, under Peoples' reading, the Comment's requirements (1) and (2) would be merged into a single condition, with § 773 providing a defense when the actor interfering with a contractual relationship has a good faith belief that it is asserting a legally protected interest.

On the other hand, Peoples' interpretation of § 773 is supported by Illustration 1 to that section, which states:

> A enters into a contract to buy Blackacre from B. C honestly believes that he has a right of way over Blackacre. With knowledge of the contract, C in good faith informs A of his interest and threatens to enforce it by legal proceedings if, as and when the owner of Blackacre should deny his claim. A thereupon refuses to perform his contract with B. C's interference is not improper under the rule stated in this Section.

Under this Illustration, C's non-liability is predicated upon the fact that it "honestly

---

19. Of course, our role as a federal district court sitting in diversity is not to predict what position would be taken by the drafters of the Restatement. Instead, we are to apply Pennsylvania law as it would be applied by the Pennsylvania Supreme Court, *see supra* footnote 18. However, as we explained above, *see id.,* the Restatement is a good indicator of how the Pennsylvania Supreme Court would rule on issues regarding intentional interference with contract.

believes" that it has a legally protected interest. There is no indication in the Illustration that C's purported interest must ultimately be found to be valid.

Peoples' interpretation of § 773 is also supported by a Comment to Section 767 of the Restatement (Second) of Torts. Section 767 lists a number of factors that should be considered "[i]n determining whether an actor's conduct in intentionally interfering with a contract ... is improper or not." [20] In particular, § 767(a) directs the court to consider "the nature of the actor's conduct." A Comment to § 767(a) deals specifically with threats of litigation that interfere with contractual relations:

> In a very early instance of liability for intentional interference, the means of inducement employed were threats of "mayhem and suits," and both types of threats were deemed tortious. Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial administration as well as to the actor's adversaries. The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication. (See §§ 674–681B).[21] ...

Restatement (Second) of Torts § 767, Comment c (footnote added).

While the above-quoted Comment makes it clear that a threat of litigation can be the basis for an intentional interference claim, it supports Peoples' position that its good faith belief in the merits of its claim is sufficient to excuse its behavior, even though that claim was not ultimately vindicated. Iowa's highest court has adopted this position, holding that

> an improper motive for these purposes means a state of mind which causes a person to pursue a legal remedy in the absence of a good-faith belief in the merits of the litigation. Even if the person has some belief in its merits, if the suit was nevertheless instituted or threatened in bad faith with the intention only to harass other persons and not to bring the complaint or lawsuit to definitive adjudication, it may be actionable.

*Nesler v. Fisher & Co.*, 452 N.W.2d 191, 197–98 (Iowa 1990) (quoting and relying upon Restatement (Second) of Torts § 767, Comment c). *See also, Orfanos v. Athenian, Inc.*, 66 Md.App. 507, 522–23, 505 A.2d 131, 139–40 (1986) (same). One federal district court in Pennsylvania has also adopted this position, in an unpublished decision, without discussing how it could be reconciled with the apparently contrary Comment a to § 773. *Mohawk v. Kahn*, Civil Action No. 87–1405, 1987 WL 30121 at *8 (E.D.Pa. Dec. 21, 1987).

Although it is a close question, the court believes that the best resolution of this issue,

---

**20.** Section 767 provides:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.; accord Nathanson*, 926 F.2d at 1388–89. As the above-quoted section indicates, "[t]he deter-

mination of whether or not the actor's conduct is improper generally requires the balancing of a number of factors. *Adler, Barish, supra*; Restatement § 767. 'This balancing process need not be performed, however, in cases involving a more or less crystallized privilege; rather, the court need only apply the privilege to the facts of the particular case.' *International Mining Co. v. Allen & Co., Inc.*, 567 F.Supp. 777, 783 (S.D.N.Y. 1983) (applying Pennsylvania and New York law); Restatement § 767, comments j and l." *Wood v. Coleman*, Civil Action No. 83–27, 1989 WL 29250 at *17 (E.D.Pa. March 29, 1989). One such privilege is the one described in § 773. *Wood*, at *18.

**21.** These sections describe the tort of wrongful use of civil proceedings.

and the resolution that would be adopted by the Pennsylvania Supreme Court if it were faced with the decision, is the position advocated by Peoples.

We first note that the Comment and the Illustration that support Peoples' position both deal specifically with the situation where, as here, the interference has been by way of a threat of legal proceedings. *See* Restatement (Second) of Torts § 773, Illustration 1; *id.* § 767, Comment c. Indeed, for the legal principles they express, this Comment and Illustration are indistinguishable from the principle at issue in the instant case. The Comment supporting Fannie Mae's position, on the other hand, is more general in scope. *See id.* § 773, Comment a. Because, when considering whether a particular form of interference is improper, "specific applications [described in the Restatement should] ... supplant ... generalization," *id.*, we conclude that Peoples' position is more strongly supported by the Restatement.

█ We reach the same conclusion by the more general considerations described in Section IV.B.4, *supra.* As the Pennsylvania Supreme Court has stated, "interferences which are sanctioned by the 'rules of the game' which society has adopted" are regarded as privileged, and are not improper means of interfering with contract. *Glenn,* 441 Pa. at 482, 272 A.2d at 899; *Silver,* 894 F.2d at 603, n. 7. We believe that the threat of a lawsuit, when instituted with a good faith belief in the merits of the claim, falls within the scope of the "rules of the game" and is therefore not improper for the purposes of determining liability for intentional interference with contract.

█ Although we hold that a defendant is not liable when it interferes with another's contract by threatening in good faith to institute litigation designed to protect what it believes in good faith to be a legally protected interest, we find that the "good faith belief" must be a reasonable one under the circumstances. To allow a purely subjective good faith belief in the merits of a litigation threat to shield an actor from liability would unjustly protect those who institute threats of litigation without any investigation or analysis as to the merits of the claim.

In reaching this decision, we are guided by consideration of the tort of wrongful use of civil proceedings.[22] This tort has been codified in Pennsylvania. *See* 42 Pa.C.S. §§ 8351–54; *Ludmer v. Nernberg,* 520 Pa. 218, 553 A.2d 924 (1989); *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020 (1987). In the respects relevant to our discussion here, the elements of the tort are the same in Pennsylvania's codification and in the Restatement (Second) of Torts. *Compare* 42 Pa.C.S. § 8351 (elements of the cause of action) with Restatement (Second) of Torts § 674 (same); *compare* 42 Pa.C.S. § 8352 (existence of probable cause) with Restatement (Second) of Torts § 675 (same).

A defendant is liable for wrongful use of civil proceeding only if she brings a civil action without probable cause. 42 Pa.C.S. § 8351(a)(1); Restatement (Second) of Torts § 674(a). "Probable cause" exists if the defendant

> reasonably believes in the existence of the facts upon which the claim is based, and either:
>
>> (1) Reasonably believes that under those facts the claim may be valid under the existing or developing law; [or]
>>
>> (2) Believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information ...

42 Pa.C.S. § 8352; *accord,* Restatement (Second) of Torts § 675.

Thus, liability for wrongful use of civil proceeding hinges on the defendant's reasonable belief in the merits of her claim, the same objective good faith standard we have adopted for a defendant who claims that her interference with contract by threat of litigation is "proper." An action for intentional interference with contractual obligations

---

**22.** Restatement (Second) of Torts § 767, Comment c, upon which we have relied, explicitly refers the reader to the Restatement's sections describing wrongful use of civil proceedings. *See supra* footnote 21 and accompanying text.

based on a frivolous lawsuit is closely related conceptually to an action for wrongful use of civil proceeding. *See Orfanos,* 66 Md.App. at 522–23, 505 A.2d at 139–40. Thus, our adoption of a reasonable good faith standard in the instant context harmonizes the elements of two closely related torts.

Upon consideration of the evidence adduced by the parties, we conclude that there is no genuine issue of material fact as to Peoples' reasonable good faith belief in the merits of the claim it threatened to assert against Chesapeake.

Our conclusion flows naturally from Peoples' theory of its claims *against Fannie Mae.* Peoples' claims against Fannie Mae, which were filed only after an inquiry into the facts and law by Peoples' attorney, *see* Croner Decl., Peoples CC–Ex. 2, are primarily based on the theory that Peoples owned the rights to the Servicing Portfolio. Although Peoples has not prevailed on that theory, we find as matter of law that the Complaint in this action was filed with a reasonable good faith belief in its validity.

Given the theory of Peoples' claims against Fannie Mae, it was all but inevitable that any entity purchasing the servicing rights from Fannie Mae would become embroiled in this litigation. Peoples' reasonable good faith belief in the validity of its claims against any purchaser of the servicing flows naturally from its theory of the case: if the servicing belonged to Peoples, then any purchaser of that servicing would have to be brought in to protect Peoples' interest in its property.

Fannie Mae attempts to show that there is an issue of fact as to Peoples' reasonable good faith by presenting evidence indicating that Peoples' counsel did not do a thorough investigation of whether there would have been personal jurisdiction over Chesapeake in Pennsylvania. *See* FNMA CC–Mem. at 6–7. Peoples responds that the existence of personal jurisdiction was obvious, and hardly deserved investigation. *See* Peoples CC–Reply at 7–9. The court need not enter into this debate. The essence of Peoples' threat was that it would sue Chesapeake if it purchased the servicing from Fannie Mae. Since *some* court would certainly have personal jurisdiction over Chesapeake, it is irrelevant whether that suit would have been brought here.

■ Because we find, as a matter of law, that Peoples' threat of litigation against Chesapeake was made with a reasonable good faith belief in the merits of the claim, we conclude that Peoples is entitled to judgment as a matter of law as to Count IV of Fannie Mae's Amended Counterclaim. *See* Fed.R.Civ.P. 56.

### 2. Sufficiency of Fannie Mae's evidence

As an alternate ground for granting Peoples' motion for summary judgment as to Count IV of the Amended Counterclaim, we find that Fannie Mae has failed to produce causation evidence sufficient to survive Peoples' motion.

A trial court can enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (quoting Fed.R.Civ.P. 56(c)), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

■ As the party moving for summary judgment, Peoples bears the burden under Rule 56 of demonstrating the absence of material fact issues. However, because Fannie Mae bears the burden of persuasion at trial as to its counterclaims, Peoples can meet its Rule 56 burden "by showing that the evidentiary materials of record, if reduced to *admissible* evidence, would be insufficient to carry [Fannie Mae's] burden of proof at trial." *Chipollini,* 814 F.2d at 896 (emphasis added) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)).

■ Causation is an essential element of the tort of intentional interference with contract. Fannie Mae has the burden of proving that Peoples actions "induc[ed] or otherwise caus[ed]" Chesapeake "not to perform the contract." Restatement (Second) of Torts § 766. As its evidence of causation,

Fannie Mae has produced a letter from Chesapeake to Fannie Mae (the "Termination Letter"). In the Termination Letter, after describing the letter it had previously received from Peoples' counsel, Chesapeake writes:

> Unfortunately, these developments with Peoples could not have come at a worse time for First Chesapeake as our investment bankers are in the middle of their due diligence review of our mortgage servicing operations in connection with our initial public offering. The company's registration statement is being filed with the United States Securities and exchange Commission on Tuesday of next week. The Transfer Portfolio would have represented a significant portion of our current servicing operations and it has been difficult explaining the unusual circumstances that have surrounded this transaction. Our counsel has advised us that the litigation by Peoples Mortgage Company would have had to have been disclosed in our registrations statement since they have threatened to institute legal proceedings against First Chesapeake.
>
> Accordingly, we regret to inform you that we cannot proceed further with the purchase of the Transfer Portfolio since title to the servicing rights appears to be seriously in question. . . .

FNMA CC–Ex. H.

■ A jury, if it accepted the truth of the Termination Letter, could reasonably find that Fannie Mae had carried its burden of proving that Peoples' actions caused the termination of its contract with Chesapeake. The Termination Letter, however, is inadmissible hearsay. Thus, the evidence adduced by Fannie Mae in support of its burden of proving causation would not be admissible at trial. Because there is no admissible evidence of record that satisfies Fannie Mae's burden of proving causation, Peoples is entitled to summary judgment as to Count IV of Fannie Mae's Amended Counterclaim.

The inadequacy of hearsay evidence is particularly evident in the instant case. The Transfer of Servicing Agreement, signed by Fannie Mae and Chesapeake *before* Peoples' allegedly tortious contact with Chesapeake, includes an indemnification clause explicitly recognizing the possibility that Chesapeake would become a party to this suit in the event that it purchased the rights to the servicing. FNMA CC–Ex. C at ¶ 15.[23]

Accordingly, when Peoples warned Chesapeake that it would be joined as an additional defendant if it went through with the purchase, it was merely stating what must have been obvious to a sophisticated entity such as Chesapeake. Given these circumstances, it would be essential for the finder of fact to be able to fully explore the question of whether Chesapeake's stated reason for withdrawal was the real reason, or simply an excuse for withdrawal based upon some other business-related calculation, an exploration that cannot be performed without an opportunity for cross-examination.

## V. CONCLUSION

Fannie Mae's motion for summary judgment is granted as to all of Peoples' claims, and the Complaint is therefore dismissed. Peoples' motion for summary judgment as to Count IV of Fannie Mae's Amended Counterclaim is granted, and, accordingly, Count IV of the Amended Counterclaim is dismissed.

---

23. The indemnification provides:
> Fannie Mae agrees to indemnify and hold First Chesapeake harmless from and against any and all losses, damages, costs or expenses, including attorney fees incurred or suffered by First Chesapeake that may result from any action, suit or proceeding by and among Fannie Mae, Peoples and First Chesapeake, in connection with the Transfer Portfolio.
> FNMA CC–Ex. C at ¶ 15.